## BRYAN & McPHAIL vs. COWART.

1. A bill which alleges that the complainant had advanced money to one of the defendants, and also executed to him, for his accommodation and without consideration, a promissory note for a large amount, and had taken from him a deed to a house and lot, which was absolute on its face but intended as a mortgage for the security of the debt created by the loan of the money and the note, that said defendant had, without consideration, transferred said note to his co-defendant, who was cognizant of the facts attending its execution, and who afterwards recovered a judgment on it against complainant; and which asks, that the deed may be declared a mortgage, that the mortgage may be foreclosed, and that the judgment at law may be enjoined, is not wanting in equity, although its allegations as to complainant's failure to make his defence to the suit at law would not be sufficient to entitle him to relief against the judgment, if the bill were filed for that purpose only.

2. The grantee of a deed, which is absolute on its face, may come into a court of equity to have it declared a mortgage.

3. An agreement that a deed absolute on its face should operate only as a mortgage, must be contemporaneous with the execution of the deed itself; otherwise, unless supported by some new consideration, it is *nudum pactum*, and no right can arise under it.

4. In ascertaining whether an absolute deed was intended as a mortgage or a conditional sale, parol proof of the intention of the parties at the time of its execution may be received.

5. The proof must be clear and convincing, to enable the court to declare an absolute deed a mortgage. Loose declarations of a trust, especially after great lapse of time, will not be allowed to overturn or affect the written contract of the parties.

6. An answer which denies the allegations of the bill upon the knowledge of the respondent must prevail, unless it is disproved by the testimony of one witness with strong corroborating circumstances, or by two positive witnesses. These witnesses must not only be credible, but their opportunities of knowing the facts about which they depose must be ample.

7. When the complainant seeks to have an absolute deed declared a mortgage, and does not examine the subscribing witnesses to the deed, to prove what transpired at the time of its execution, the fair presumption is, that their testimony would militate against him; and such failure casts a shade of suspicion on his cause, which will induce the court to regard with more jealousy, and examine with stricter scrutiny, the less convincing proof on which he relies.

8. When the complainant fails to make out the only ground for relief which gives a court of equity jurisdiction of his case, his bill cannot be retained on account of other grounds of relief, even if the proof sustains them.

ERROR to the Chancery Court of Barbour.

Tried before the Hon. J. W. LESESNE.

William Cowart filed his bill in the Chancery Court of Barbour, against Moses Bryan and David McPhail, in which he alleges that, in 1838, Bryan applied to him to procure a loan of $500 for the defendant McPhail, who was Bryan's son-in-law; that complainant made the loan, and Bryan became security for McPhail; that about a year afterwards complainant made another loan, of $622, to McPhail, at the instance of Bryan; that, at the time of the last loan, complainant surrendered to McPhail the note for the previous loan, and with his consent it was cancelled; that, at the same time, it was agreed that Bryan should advance a sum equal to the two loans made by complainant to McPhail, and that both Bryan and complainant should each execute to McPhail his promissory note for $1,042$\frac{12}{100}$, which was accordingly done; that at this time complainant and Bryan took from McPhail a deed for a certain house and lot in the town of

Eufaula, which is particularly described in the deed which is made a part of the bill; that this deed, though absolute on its face, was intended as a mortgage and a security for the money thus advanced; that the advancement was made to enable McPhail to complete the building, and the notes were given without any consideration, but merely to correspond with the amount stated in the deed as its consideration; that at the commencement of these transactions, he was wholly unacquainted with McPhail, and advanced the money at the instance of Bryan, whom he knew; that complainant never took possession of the premises, nor received the rents and profits, but that McPhail retained and held both; that Bryan never made any advance of money to McPhail, as he had agreed to do, nor does complainant believe that he ever paid his note for $1,042$\frac{12}{100}$; but that said Bryan has retained constantly since both his own note and complainant's; that he now pretends to have obtained complainant's note by transfer from McPhail, and has brought suit on said note against complainant in the Circuit Court of Barbour, and recovered judgment; that complainant endeavored to prevent a recovery, by offering to prove the foregoing facts, but his defence was ruled out by the court; that execution has issued on the judgment, and is now in the hands of the sheriff: that Bryan and McPhail have wholly failed to repay the money advanced by complainant to McPhail.

The bill prays that the deed may be declared a mortgage, that the mortgage may be foreclosed, that the premises may be sold, and that the judgment may be enjoined; or, if the court should not hold the deed a mortgage, then he prays that McPhail may be made to account for the rents and profits, and that they may be applied to the satisfaction of Bryan's judgment against complainant.

The defendants filed separate answers. Bryan admits that Cowart advanced the $500 to McPhail at his instance. He also admits the payment by Cowart of the sum of $622, but he positively denies that it was intended as a loan to McPhail. He alleges that, at the time this payment was made, Cowart and himself purchased the house and lot from McPhail, and the $622 was paid by Cowart on this purchase; that the price of the lot was agreed on between the parties, one-half of

which Cowart agreed to pay, and the other half was to be paid by respondent; that at this time Cowart surrendered to McPhail said note for $500, paid the $622, and executed the note on which the judgment mentioned in the bill was founded; that at the same time respondent agreed to pay to McPhail, or to account with him for a like sum, which respondent did by crediting McPhail on advancements already made to him, and by giving his note for $500, which respondent has since paid; that thereupon McPhail made the deed to Cowart and respondent mentioned in said bill; that this deed was never designed as a mortgage, but was intended to be, what on its face it purports to be, an absolute deed of bargain and sale; that he has long since paid to McPhail his portion of the purchase money, and is the owner, for valuable consideration, of the note on which the judgment is founded. He admits that McPhail has kept possession of the house, but alleges that he did so as the agent of Cowart.

McPhail admits that he borrowed the $500 as charged, and that he afterwards received from Cowart $622; but denies that it was as an additional loan to enable him to finish his house, and alleges that it was paid as a part of the purchase money of the house and lot mentioned in the deed, and was paid contemporaneously with the making of the deed, and with the cancellation of the $500 note. He also denies that the deed was intended as a mortgage, and insists that it was an absolute deed of conveyance, and that such was the intention of all the parties. He admits that Cowart then made the note on which judgment was rendered, but denies that it was made without consideration, or for the mere purpose of corresponding with the amount named in the deed; but, on the contrary, asserts that it was for the balance of Cowart's portion of the purchase money for the house and lot according to the agreement between them; denies that Bryan has not paid his portion of the purchase money according to his contract; alleges that he owed Bryan all that the latter was to pay, except $500, for which Bryan executed to him his note, which he has since paid in full; that some time after Cowart's note was delivered to respondent, he sold it to Bryan, who paid him the full amount of it. He disclaims all interest in the judgment, and denies all fraud. He alleges that he

was in possession of two rooms in the house as tenant for Cowart & Bryan, and of the remainder of the house as their agent, in which latter character he rented the rooms to others, and received the rents, for all which he is ready and willing to account.

After the testimony was taken, the bill was amended, by making a fuller averment of an attempt to defend the suit at law, and alleging McPhail's insolvency. The consideration for the making of the deed, as expressed on its face, is $4,399$\frac{21}{400}$. The subscribing witness to it are James McNabb and James Gresham.

Jacob Nelson, the first witness in behalf of complainant, whose deposition appears in the record, testifies that Bryan told him in 1842, that Cowart and himself had kept McPhail's house from being sold, and that they held the house in their own names; and in another conversation, when Bryan was complaining of Cowart, he told witness that he held Cowart's note for $1,040, and when asked why he did not sue on it, replied, that there was a secret about the note, that he could not sue on it, that it was given about the time McPhail failed. This witness was not cross-examined by the defendants.

L. C. Harrison, another witness for complainant, testifies that Cowart handed him a note on Bryan, does not recollect the time, but his impression is that it was in 1843, in payment of a debt due witness; does not recollect who was the payee of the note; it was paid, and the proceeds applied to Cowart's credit; does not know who paid it; has no recollection of any conversation with B. concerning it; the whole business was attended to by his book-keeper.

McIntyre, another witness for complainant, testifies that McPhail told him, in June, 1841, that he was paying interest on $2,200, which Cowart and Bryan had advanced for him on the brick-house in Irwinton, and that the rent of the house would soon pay it; that Cowart and Bryan held a mortgage on the house. Witness further says, that at various times he heard McPhail say—that he was renting the house at from $10 to $12 per month; that in March, 1842, Bryan told witness he was owing Cowart borrowed money, and having taken Cowart's notes to one Roberts he was short of money, and could not pay witness what he owed him.

G. C. Hodges, another one of complainant's witnesses, deposes that he met Bryan in 1846, at Columbus, Ga., when a conversation took place between them about the note; witness observing that it was wrong for old neighbors to fall out, alluding to Bryan and Cowart, Bryan replied, that if Cowart had not attempted to keep John E. P. Cowart's property back, the note should never have come against him.

Robert Hill, another one of complainant's witnesses, deposes that, in 1843, he was present when Bryan and the Cowarts had an interview at Bryan's shop; they met, as witness understood, to make friends; Bryan and complainant shook hands at parting; witness did not hear what passed between them, but, after the Cowarts left, Bryan told him that they had made friends, and when he (B.) had destroyed a note in his possession, which he would do that evening, everything would be settled between him and complainant; in 1842, or early in 1843, witness had heard Bryan speak of having borrowed money from Cowart.

M. A. Browder, for complainant, testifies that, in the spring or fall of 1838, Bryan applied to him for a loan of money, for the purpose of relieving McPhail's house from the debt for building it, Bryan expressing his apprehensions that it would be sold; witness could not let him have the money; a few months afterwards, witness asked Bryan whether he had arranged that business for McPhail, and Bryan answered that he had got the money from Cowart, and saved the property, and witness thinks he said that he had taken the title in his own name.

J. Buford, for complainant, testifies that, from 1838 to 1843, he alone, and himself and partner, rented a room in the house in controversy; that he rented of McPhail, and when making payments took receipts signed by McPhail, which are appended to his deposition; McPhail seemed to have the sole control of the property during those years; witness thinks that in settling his last account he paid a part in a note on Bryan.

John McNabb, one of defendants' witnesses, testifies, that in the latter part of 1838 or in 1839, Bryan deposited $1,600 or $1,700 with witness and his brothers, with instructions to pay it over to McPhail, which was accordingly done; a part

of it was used to pay workmen on the building; after this Bryan drew $400 or $500 from the Bank at Montgomery, and from this source McPhail received money, but witness does not state how much. This witness was cross-examined, but his testimony remains the same in effect.

Geo. W. Thomas, for defendants, deposes, that in 1845 he went to complainant, for the purpose of renting a room in the house mentioned in the bill, when complainant referred him to McPhail, saying that he (McP.) was his agent to rent out the house; witness then went to McPhail, who rented him the house as agent of complainant.

Stow, a witness for complainant, deposes, that McPhail occupied and rented the house in dispute, from 1840 to 1846 or 1847, when he abandoned it, after the judgment at law was obtained against Cowart; supposes that McPhail received the rents; knows that he received the rent for one year of one room which was used by the Town Council; witness estimates the rents, and values the lot and building in 1839–40 at $2,500; says that the value of the property rapidly declined after 1840.

T. Robison, a witness for defendant, testifies, that he has known the premises since the house was built; that they were occupied by McPhail and others until the spring of 1847, when he abandoned them; in 1839 the building and lot was worth $4,000, but has been steadily declining in value; that the rents in 1839 and 1840 were worth $700 each year; in 1841 and 1842, half that sum; and steadily declined; when McPhail abandoned the premises, they were not worth more than $300, and the annual rents $50.

At the hearing, a motion was made to dismiss the bill for want of equity, which was overruled. Upon the state of facts above set forth, the Chancellor declared the deed a mortgage, decreed a foreclosure of the mortgage, and a perpetual injunction to the judgment at law, and directed the Master to state an account, &c.; and all these things are now assigned for error.

COCHRAN and S. F. RICE, for plaintiffs in error:

1. A collateral writing (the deed) does not exclude oral evidence, to show the consideration or want of consideration

in the note sued on.    If the complainant ever had any remedy against the note, that remedy was in the court of law.    1 Starkie on Ev. 394, § 16; Laroque v. Russel, 7 Ala. 798; Bates v. Terrell, 7 Ala. 129; 1 U. S. Dig. (Supplement) 731 to 733.

2. The judgment at law is conclusive of every fact and question which might have been tried there; such as the question, whether, at the date of the note and deed, McPhail was indebted to Cowart, or Cowart to McPhail, &c.

3. Where the plaintiff's own witness proves that he is not entitled to sue in Chancery, although the evidence is not pertinent to the issue, the court is bound to notice it.    A law court will do so, and of course Chancery will.    Chancery always looks to see whether complainant's hands are clean, and whether he ought to have its active aid.    Susan v. Wells, 3 Brevard's Rep. 11.

4. Whenever, in proving or attempting to prove his right to relief, the complainant proves that the transaction out of which his case arises, is part of a scheme to defraud the creditors of a known insolvent, the Court of Chancery cannot soil its hands by becoming the agent or minister of either party to such fraud, to consummate their unlawful agreements.

5. Chancery has no jurisdiction of the case made by the bill.    But if it has, the case made by the bill is not sustained by proof against the responsive denials of the answers.

BUFORD, *contra:*

1. As to jurisdiction : at law, a deed cannot be explained as a mortgage, 12 Ala. 678 ; 8 Conn. 189; 4 Mass. 443; 2 Sumner, 527; 13 Mass. 446, even when the question arises collaterally, and between strangers to it.    8 Conn. 121; 7 ib. 143; ib. 409; 3 Phil. on Ev. 1422, 1431–5, note 961; 2 Am. Chan. Digest 180–6; 5 Smedes & M. 91; 14 Ala. 218; 2 Conn. 481; 6 ib. 653; 5 Stew. & P. 67; 4 ib. 116; 1 Ala. 438; 3 Johns. 508.    But in equity, an absolute deed may be explained to be a mortgage.    14 Ala. 221.    If the transaction was intended as a security, the form is immaterial.    2 Sumner, 533; 5 Paige, 9; 2 J. J. Mar. 471; 1 Johns. Ch. R. 594; Dev. Eq. R. 373; 12 Mass. 456; 6 Monroe, 120; 3 J. J. Mar. 354.    The grantee may treat the deed as a mortgage,

and apply for a foreclosure. 9 Wheat. 489; 5 U. S. Con. R. 648.

Though a party may defend on one ground at law, yet if equity has jurisdiction on another ground, he may go into equity after a judgment at law. 13 Ala. 200; 8 ib. 35; 1 Am. Chan. Digest 348. As to the foreclosure the jurisdiction is clear, and the right to enjoin the judgment at law, or to order the money to be refunded if paid, follows as an incident. Bryan, being cognizant of all the facts, has no better equity than McPhail; and it seems, when the note constitutes the over-payment, money may be recovered back, even at law, though paid on judgment. 11 Mass. 66. But suppose the foreclosure and injunction were independent, rather than incidental causes of action, yet as they grew out of the same transaction, cognizance of one branch draws after it jurisdiction of the other. Story's Eq. Pl. §§ 283, 284; 1 Story's Equity § 68, 73. And where the remedy is more complete in chancery, jurisdiction attaches. 4 Howard (Miss.) 455; 6 Ala. 24.

The attempt of Bryan and McPhail to treat the note as binding is "using it against the intent of the parties," and is such a fraud as gives equity jurisdiction. 14 Ala. 220. Cowart could not defeat the note, without showing the deed to be a mortgage, which he could not do at law; and the suit at law was making that court an instrument of injustice, where equity will interpose. Story's Eq. Pl. 472.

II. As to the evidences of the deed being a mortgage: The vendor remained in possession. 2 Sumner 536; 3 Powell on Mortgages 1090. The transaction began by the proposition to borrow money. 2 U. S. Con. R. 481. The relation of debtor and creditor existed. 7 Ala. 724. Bryan and McPhail both admit in their answers that Cowart's note was never in McPhail's hands. Bryan did not advance his portion of the cash, as per agreement. Both answers admit a deficit of $500. Where the *onus* is on the defendant, his answer to a negative allegation is no proof. 6 Ala. 718. McPhail states Bryan's advance to have been partly made prior to the purchase. A failure to take note is not conclusive of sale. 12 Ala. 678; 16 ib. 472. Several witnesses testify to facts showing that the deed was treated as a mort-

gage by the parties. And this evidence is sufficient to outweigh the answers, though positive, clear, precise and definite. Greenl. § 260; 2 Peters U. S. Digest 258, §§ 11, 35.

LIGON, J.—The Chancellor did not err in refusing to dismiss the bill for want of equity. In its form, structure and matter, it is not alone a bill to enjoin a judgment at law; but it contains allegations on which it seeks relief, that could only be sought in, and extended by a court of equity. On this motion all the allegations of the bill are admitted to be true. These assert, in terms or effect, that the deed from McPhail to Cowart and Bryan, though absolute on its face, was intended by the parties to operate as a mortgage, and one object of the bill is to have it so declared, and to obtain a decree of foreclosure. A court of equity is the only forum which can hear and determine such matters, and having jurisdiction for this purpose, it may rightly take it for the purpose of doing complete justice between the parties; and, if, to accomplish this end, and to prevent oppression and injustice, an injunction was necessary, it would not hesitate to grant one.

This case is wholly different, when viewed in all its aspects, from that large class of cases to which we are cited by the counsel for the plaintiffs in error, and which determine the rules that govern the conduct of the Chancellor, in granting injunctions to judgments at law, for the purpose of enabling the defendant to wage, in equity, a legal defence, which he had been prevented from setting up on the trial at law by fraud, or accident, or the act of the opposite party, unmixed with any fault or negligence of his own.

But it is contended, that the right to come into a court of equity, for the purpose of showing that a deed, absolute on face, was intended to operate only as a mortgage, is confined exclusively to the grantor. That such is the character of nearly all the cases with which the books abound, I readily admit, and this, for the obvious reason, that in such transactions the hardships, if any exist, generally fall on the grantor. But I can see no good reason why the grantee, if he desires to do so, may not become the actor. The agreement by which the absolute terms of the deed are to be controlled, is mutual, and to deny either party the right of seeking to enforce it would destroy that mutuality.

Again, it is not uncommon for men to lend money on securities, of which they do not wish to become the permanent owners. They may be ample to indemnify, and exceed in value the sum advanced upon them, still, the lender may not desire to make a permanent investment in them; and I know no rule of law which will authorize the borrower to force him to do so, contrary to their agreement, and such would be the effect of the rule contended for. Such securities may depreciate in value, and though once sufficient, they may, by the fluctuations of trade, become wholly inadequate as an indemnity before the law day of the mortgage arrives. The loss thus resulting should not be thrown on the lender, when he had protected himself against it by the terms of his agreement with the borrower; and unless he is allowed to become the actor, such would be the inevitable result. In nearly all cases of loans upon mortgage securities, or securities in the nature of a mortgage, the object of the lender is to make a profit by the use of his money, and when, by his agreement, he becomes the holder of the legal estate in the thing transferred, and engrafts upon it a secret trust in favor of the borrower, there is no rule of law, within my knowledge, which denies him the right, after the time agreed on for the repayment of the money has passed, to come into a court of chancery to foreclose the borrower's equity of redemption, and discharge himself from the responsibilities of the trust.

In the case under consideration, no other conclusion can be drawn from the allegations of the bill, than, that Cowart was willing to loan his money on the security of the house and lot, but that he was unwilling to invest it permanently in such property. On this state of facts, he has a clear and unquestionable right to appeal to a court of chancery to establish his agreement, and when he makes out his case, by sufficient proof, to foreclose the deed as a mortgage, and to discharge himself from the trust in favor of McPhail. The latter will not be allowed, in fraud of his agreement, to make him the unwilling owner of an estate, which he neither agreed to purchase nor desired to own; and to change his own character from that of an obliged money-borrower, to that of a vendor of real estate who has only received his purchase money. Yet such would be the effect of allowing the motion to dismiss, for the cause last examined.

2. We will next examine whether the case made by the bill is sustained by the pleadings and proof.

Before, however, we enter upon an examination of the facts, let us advert to such of the general rules of law, as, by the almost universal judgment of the courts, govern in cases in which an absolute deed is set up as a mortgage. In Freeman v. Baldwin, 13 Ala. 246, in which an absolute bill of sale, accompanied by a defeasance, formed the basis of the litigation, this court held, that the deed and defeasance must be shown to be contemporaneous acts, so as to form one transaction, one agreement. See also, 2 John. Chy. Rep. 189; 2 Greenleaf's Rep. 152; 12 Mass. 456. If the deed be made at one time, and the defeasance at another, and the latter is unsupported by any new consideration, it is *nudum pactum*, and no rights can arise under it.

Another rule is, that, in ascertaining whether an absolute deed was intended as a mortgage or a conditional sale, parol proof of the intention of the parties at the time of its excution may be received. Hudson v. Isbell, 5 S. & P. 67; English v. Lane, 1 Por. 328; Turnipseed v. Cunningham, 16 A. R. 501.

It is also held, that to enable the court to declare an absolute deed to be a mortgage, the proof must be clear and convincing. Loose declarations of trust, especially after great lapse of time, will not be allowed to overturn, or affect the written contract of the parties. Freeman v. Baldwin, *supra*.

In referring to the authorities to sustain the rules above laid down, I have confined myself mainly to those which are found in our own court: an extensive examination, however, of those to be found in the decisions of other courts, has satisfied my mind that they may be considered, as of general, if not of universal application, where trusts of this kind are allowed to be set up against the express terms of a deed.

Let us apply them to the case under consideration, and by their direction, aided by such other rules of law and practice as must control the case, examine the complainant's right to the relief he seeks by his bill.

The answers of both the defendants deny, in express terms, that the deed was ever intended as a mortgage. It is a familiar rule in chancery proceedings, that where the answer de-

nies the allegations of the bill, upon the knowledge of the respondent, it must prevail, unless it is disproved by the testimony of one witness, with strong corroborating circumstances, or two positive witnesses. These witnesses must not only be credible, but their opportunities of knowing the facts about which they depose must be ample. And in cases like the present, those facts must be shown to have existed at the time the deed was made, so as to render them contemporaneous with its execution, and a part of the agreement out of which it sprung. To persons present when the deed was made, and who became subscribing witnesses, we would most reasonably look for an intelligent and truthful account of what occurred at the time of its execution. When there are such persons in existence, and they are not produced to prove what transpired when it was made, the fair presumption is, that their testimony would militate against him whose case they could sustain or destroy. This failure alone, in the eye of the law, casts a shade of suspicion over the cause of the complainant, and will induce the court to regard with more jealousy, and examine with stricter scrutiny, the less convincing proof on which he relies. To this deed there are two subscribing witnesses, and no reason is given why their testimony was not produced at the hearing.

We must, then, resort to the deed itself, and the answers of the two defendants, as the best exponents of the intention of the parties. These correspond perfectly with each other, and directly contradict the allegations of the bill. All the witnesses who testify of conversations with the defendants to the bill, with the exception of Browder, speak of conversations which occurred from two to four years after the transaction, and it may be remarked, that none of these conversations appears to have been held under such circumstances as would entitle them to any grave consideration, or with persons to whom it would be likely the parties would make a very free communication of their private affairs. I say this, because none of the witnesses testify that the relations between themselves and the party with whom they conversed, amounted to more than ordinary acquaintanceship; nor do they show that they were creditors, who were inquiring into the condition of their debtor, and upon whose memories all

that was said upon the subject of property, would be likely to impress itself deeply. These conversations, then, and the admissions contained in them, may be regarded as little, if indeed they amount to any thing, more than loose declarations of the party making them; and certainly they do not rise to the dignity of that clear and convincing parol proof which is allowed to control the written contract of the parties.

Nelson, the first witness examined in behalf of the complainant, deposes, that, "in 1842," (four years after the deed was made,) "he heard Bryan say, that he and Cowart had kept McPhail's house from being sold, and that they held the house in their own names." McIntyre says, that "in June, 1841, (more than three years after the date of the deed,) McPhail told him, he was paying interest on $2,200, which Cowart and Bryan had advanced for him on the brick house in Irwinton, and that the rent of the house would soon pay it up; that Cowart and Bryan had a mortgage on the house." Browder says, that, "in the spring of 1838," (the deed is dated in February of this year,) "Bryan applied to him to borrow money for McPhail; that he had none to lend at that time; and a few months afterwards, Bryan, in reply to a question asked by witness, told him that he had got the money from Cowart, and had saved McPhail's property, and witness thinks, he said, he had taken the title in his own name." These are all the admissions of Bryan and McPhail, relied on by the defendant in error, to show that the deed was intended as a mortgage. To this may be added the fact, that McPhail lived in the house himself, and rented some of the rooms to others, from whom he received the rent; and the further fact, that Bryan did not sue on the note for nearly six years, and at one time said, "there was a secret about it," and at another declared "that he and Cowart had made friends, and when he destroyed a note which he held on Cowart, which he intended to do that evening, every thing would be right." But little importance can be attached to the fact of McPhail's possessing and renting the premises, when we read the deposition of the witness Thomas, who says, that, in 1845, he went to Cowart to rent one of the rooms of the house, when Cowart told him that McPhail was his agent to rent the house, to whom witness applied, and from whom, as such agent, he

8

rented the room he desired. The declarations of Bryan are too enigmatical and uncertain to entitle them to much weight. From the former, it would be rashness to infer that the "secret" could only relate to the existence of the trust in him and Cowart, in favor of McPhail; and the latter may as well point to the note of Cowart, which he paid to Roberts, as to the note in dispute. These things give but little strength to the insufficient proof before recited.

Allow to the proof of the defendant in error all the force to which it is entitled, it does not equal the testimony of one positive witness, who knew the agreement between the parties; and yet, under the rule of evidence which we have cited as governing this case, the testimony of such a witness would not prevail against the answers, unless aided by pregnant circumstances, or the proof of another witness.

From this review of the facts and law of the case, it is clear, the decree of the Chancellor on this branch of the case cannot be sustained.

All the other defences urged in the argument against the collection of the note on which the judgment is founded, are of a character purely legal, and as the defendant in error has failed to make out the only ground for relief which gave a court of equity jurisdiction of his case, the bill cannot be retained on account of the other grounds of relief, even if the proof sustained them; which, in our opinion, is not the case.

It only remains to add, that the decree of the Chancellor is reversed, and decree is here rendered dismissing the bill, at the cost of the defendant in error, both in this court, and the court below.